**SO ORDERED.**

**SIGNED August 27, 2010.**



_____
**ROBERT SUMMERHAYS**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA

IN RE:

AMERICAN INTERNATIONAL REFINERY, INC.
AMERICAN INTERNATIONAL PETROLEUM CORP.  CASE NO. 04-21331

    Debtors  Chapter 11

-------------------------------------------------------------------
ROBBYE R. WALDRON, LIQUIDATING TRUSTEE

    Plaintiff

VERSUS  ADV. PROCEEDING NO. 06-2015

ADAMS AND REESE, LLP

    Defendant

-------------------------------------------------------------------
MEMORANDUM RULING
-------------------------------------------------------------------

    The present matter is an adversary proceeding filed by the Liquidating Trustee (the "Trustee") of the AIPC Liquidating Trust against Adams & Reese, LLP, the former counsel for the debtors-in-possession, American International Refinery, Inc. ("AIRI") and

American International Petroleum Corp. ("AIPC" and, together with AIRI, the "Debtors"). The Trustee seeks disgorgement of attorney fees awarded to Adams & Reese and additional damages based on claims that Adams & Reese failed to disclose that it had a disqualifying conflict of interest at the time it was retained arising from its pre-petition connections to the Debtors and one of the largest creditors of the estate. Following a trial on the merits, the court took the case under advisement. The court has considered the record, the parties' arguments, and the relevant authorities. The court's disposition of the Trustee's claims is set forth below.

**JURISDICTION**

The case has been referred to this court by the Standing Order of Reference entered in this district which is set forth as Rule 83.4.1 of the Local Rules of the United States District Court for the Western District of Louisiana. No party in interest has requested a withdrawal of the reference. The court finds that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Memorandum Ruling constitutes the court's findings of fact and conclusions of law pursuant to Rule 7052, Federal Rules of Bankruptcy Procedure.

## FACTUAL BACKGROUND

### A. Overview.

This case arises from Adams & Reese's representation of the Debtors in the underlying Chapter 11 case. AIPC was a publicly-held Nevada corporation. AIPC historically carried on its operations through wholly-owned subsidiaries. AIPC's wholly-owned subsidiaries included AIRI, St. Marks Refinery, Inc. ("SMR"), and American International Petroleum Kazakhstan ("AIPK"). Through its subsidiaries, AIPC refined crude oil feed stock, produced, processed and marketed products at its Lake Charles, Louisiana refinery, and engaged in oil and gas exploration and development in western Kazakhstan. AIPC formed AIPK to hold assets related to its exploration and development activities in Kazakhstan. AIPK's primary assets were (1) a gas concession for the Shagyrly-Shomyshty gas field in Kazakhstan ("License 1551"); and (2) 95% of the outstanding shares of Too Med Shipping Usturt Petroleum Limited ("MSUP"), which in turn owned 100% of another Kazakh concession ("License 953").

AIPC and AIRI filed for relief under Chapter 11 on October 7, 2004. None of AIPC's other subsidiaries filed for relief. The court subsequently approved Adams & Reese's retention as the Debtors' counsel. Adams & Reese is a regional law firm based in New Orleans with offices in Texas, Mississippi, Alabama, Florida,

-3-

Tennessee, and Washington, DC. AIPC became an Adams & Reese client through the efforts of Andrew Pidgirsky, who was then an associate in Adams & Reese's Houston, Texas office. Adams & Reese had represented AIPC for several years prior to the bankruptcy case, and had represented AIPC in regulatory, corporate, and general litigation matters. In addition to Pidgirsky, two other lawyers in the Houston office were involved in representing AIPC in the bankruptcy case, Mr. Walter Cicack and Mr. Dean Ferguson. Mr. Pidgersky and Mr. Ferguson were the primary attorneys managing the bankruptcy case. Robin Cheatham of the Adams & Reese's New Orleans office also appeared on the pleadings. On October 10, 2006, the court granted Adams & Reese's Third Interim and Final Application For Compensation and Reimbursement of Expenses. Adams & Reese was awarded a total of $678,936.25 in fees and $63,100.67 for out-of-pocket expenses through this October 10th order.

At the time of filing, the Debtors' largest creditors were GCA Strategic Investment Fund Limited (approximately $16 million) and Halifax Fund, L.P. (approximately $13 million). (Exh. P-9, B-11, B-12, E-75). Halifax held a first priority security interest in most of the assets of AIRI, including a refinery in Lake Charles, Louisiana. GCA's security interest was heavily litigated in the bankruptcy case and is the subject of many of the allegations underlying the Trustee's claims. The Debtors' bankruptcy schedules

-4-

list GCA as a secured creditor with a security interest in AIPK stock and a dividend pledge. (Docket Entry No. 5). After the case was commenced, the court approved a settlement between the Debtors and Halifax.

**B.   Adams & Reese's Role in the Pre-petition Transactions Involving License 1551.**

The Trustee's allegations are based in part on a series of pre-petition transactions that culminated in the sale of 85% of AIPK's interest in License 1551 to Bridge Hydrocarbons, LLC. These transactions are also the basis for a separate fraudulent transfer action that is currently pending – <u>Searcy, et al. v. Knight, et al.</u>, No. 06-2018. In October 2003, AIPC created Caspian Gas Corporation ("CGC") as a wholly-owned subsidiary of AIPK, and License 1551 was transferred to CGC.   In January 2004, AIPC and AIPK transferred 85% of the outstanding shares of CGC to Bridge for approximately $5 million. (Exh. E-110, B-36). Approximately half of this amount was paid to AIPC's officers and directors for back wages and retention payments.   Adams & Reese did not formally represent any party in these transactions, but was asked to serve as a neutral escrow agent. (2 Tr. 255).   However, its services were terminated and another law firm acted as escrow agent. (<u>Id</u>.). The Trustee contends that Adams & Reese did not disclose its role in these transactions in its papers seeking retention.

-5-

The CGC/Bridge transactions also factor into the dispute over GCA's security interest and the Trustee's claim that Adams & Reese advanced GCA's interests to the detriment of the estate. In connection with this transaction, GCA executed the Consent and Agreement, which purportedly released GCA's security interest in AIPK stock. (Exh. P-2). At the same time, GCA sent a letter dated December 11, 2003 to AIPC indicating that its "consent to release certain collateral" was subject to certain terms and conditions. (Exh. E-110). AIPC apparently never fulfilled those required conditions. When the closing of CGC's transaction occurred, the lender waived the requirement for the release of GCA's security interest in the stock. In return for the release, GCA was to receive substitute collateral in the form of an assignment of dividends payable from CGC to AIPK. The dividend assignment, however, was not executed prior to the closing of the CGC transaction. Adams & Reese drafted the dividend assignment during pre-petition negotiations between the Debtors and GCA. (Exh. P-6). Although the dividend assignment was dated pre-petition (January 27, 2004, to reflect the closing of the CGC/Bridge transaction), it was not fully executed until after the case was commenced in October 2004. The Trustee contends Adams & Reese never disclosed the release or the dividend assignment and continued to treat GCA as a creditor secured by the AIPK stock.

-6-

**C.  Adams & Reese's Representation of AIPC Leading Up to the Bankruptcy Case.**

AIPC engaged Adams & Reese to assist in restructuring the company in early 2004. The record supports Adams & Reese's contention that AIPC management sought out a source to pay Adams & Reese's retainer because AIPC did not have adequate cash to pay the retainer. On October 4, 2004, GCA entered into a Security Agreement with SMR whereby GCA loaned SMR $200,000 in exchange for a security interest in the proceeds of the sale of real estate in Florida. SMR directed GCA to forward the funds to Adams & Reese, and on October 4, 2004 the firm received the $200,000 in a wire transfer with the notation "FBO AM INT PETROL*//CORP*" (B-89, E-14). Adams & Reese's retention application fails to disclose that GCA indirectly funded Adams & Reese's retainer.

In the weeks leading up to the bankruptcy filing in October 2004, AIPC and GCA negotiated what the parties termed the Pre-Petition Agreement. This agreement was essentially a lock-up agreement committing GCA to vote in favor of the Debtors' plan of reorganization as long as the plan provided the treatment of GCA's claim as set forth in the agreement. (Exh. P-7). Under the terms of the agreement, the plan proposed by the Debtors would cancel all existing equity interests and issue a pro rata share of the equity of a restructured AIPC to all creditors. The Pre-Petition Agreement

-7-

was not fully executed prior to the filing of the bankruptcy case. The Pre-Petition Agreement was amended in February 2005 to extend the time period for the Debtor to file a plan consistent with the original agreement. (Exh. P-8). In the end, the plan that was ultimately confirmed was not based on the lock-up agreement, but was based on a settlement between GCA and the Equity Security Holders Committee (the "Equity Committee") following litigation over GCA's security interest.[1]

**D.    The Bankruptcy Case and the Settlement Between GCA and the Equity Committee.**

The bankruptcy case was marked by disputes and litigation over the treatment of GCA's claim in the plans proposed by the Debtors. The Equity Committee objected to each of the plans filed by the Debtors, and ultimately requested the appointment of an examiner. The Equity Committee challenged the validity of GCA's security interest and argued that GCA should not be treated as a secured creditor in the plan.    According to the Equity Committee, the Debtors' plans proposed "such beneficial treatment of the claim of GCA ... as to be abusive of both the other unsecured creditors and equity ...."    (Exh. B-16).    The Equity Committee also challenged the Debtors' proposal to sell AIPK's remaining 15% stake in CGC  for

---

[1]    The Equity Committee was appointed by the United States Trustee on July 13, 2005.

-8-

$16 million pursuant to 11 U.S.C. §363 (the "Motion to Sell").

In light of the stalemate in the case, GCA also filed a motion for relief from the automatic stay. Ultimately, four matters were scheduled to be heard by the court on January 19, 2006: (1) the Equity Committee's Motion to Appoint Trustee or Examiner, (2) the Debtor's Second Amended Chapter 11 Plan, (3) GCA's Motion for Relief from Stay, and (4) and the Debtor's Motion to Sell. (Exh. B-10, B-12, B-17, B-18). The parties conducted discovery prior to the hearing, including depositions and the production of documents. Following two days of testimony, the Motion to Sell was granted, the Motion for Relief from Stay was withdrawn by GCA, the Motion to Appoint an Examiner was withdrawn by the Equity Committee, and confirmation of the Debtors' plan was denied. (Exh. B-37, B-38). The Equity Committee did not appeal the order granting the sale of CGC or any other matters arising from the two-day hearing in January 2006.

Following the court's ruling, the Equity Committee and GCA began settlement discussions. These discussions culminated in a settlement in March 2006. The settlement provided that GCA would receive $14 million on account of its secured claim. The payment to GCA was to be funded out of the $16 million received from the sale of the Debtors' remaining interest in CGC. The remaining $2 million from the sale was to fund payments to unsecured creditors and

-9-

equity. On August 17, 2006, the court confirmed the Debtors' Seventh Amended Plan. The confirmed plan provided for the satisfaction of all secured claims, payment of unsecured claims in full, and a distribution to equity.

## E. The Creation of the Liquidation Trust.

The confirmed plan provided for the creation of the Liquidation Trust as a representative of the estate. The role of the Trust was to liquidate AIPC's assets (including causes action held by the estate) for the benefit of creditors. Jason Searcy was appointed as the initial Liquidating Trustee (or "Trustee"). Searcy subsequently withdrew as Trustee and Robbye Waldron was appointed Trustee. The confirmed plan further provided that the proceeds from the sale of AIPK's remaining stake in CGC would be used to "fund the Plan and the Liquidation Trust." (Confirmed Plan at 11).

## F. The Present Case.

This adversary proceeding was commenced by Mr. Searcy on September 20, 2006. As originally framed, the Trustee's complaint asserted fraudulent and preferential transfer claims under 11 U.S.C. §§ 547, 548 and 550 against Adams & Reese. On September 12, 2007, the court granted the Defendant's Motion for Partial Summary Judgment and dismissed the Trustee's avoidance claims and punitive damage claim. The court granted the Trustee leave to file an amended complaint limited to his claim for disgorgement. That

-10-

amended complaint was filed on October 8, 2007. Shortly thereafter, Mr. Searcy was replaced by the current liquidating trustee, Robbye Waldron, whose counsel participated in the court's scheduling conference on December 7, 2007. The court entered a scheduling order on December 11, 2007, setting a deadline of February 29, 2008, to file amended pleadings. This order also provided that:

> Leave of court to amend pleadings will not be given except upon motion, a showing of good cause why amendment was not earlier sought, and a finding that the amendment will not necessitate further discovery or otherwise delay the proceeding.

The Trustee subsequently filed a Motion for Leave to File Amended Complaint. The Trustee's proposed amended complaint added claims for fraud, fraudulent inducement, conspiracy, and breach of duty. The proposed amended complaint grounded the fraud and fraudulent inducement claims on the treatment of GCA's claim in the Debtors' confirmed plan of reorganization and the pre-confirmation settlement between GCA and the Equity Committee. The Trustee contends that GCA did not have a valid security interest and should not have been treated as a secured creditor, that Adams & Reese knew about the invalidity of GCA's security interest, and that Adams & Reese sought to benefit GCA to the detriment of the estate by concealing the status of GCA's claim. The Trustee contends that Adams & Reese had an incentive to favor GCA because GCA was the source of its

-11-

retainer. The court denied leave to amend the complaint to add the fraud-based claims on the grounds that (1) the fraud claims merely re-litigated issues that had already been resolved in the confirmed plan (e.g. the validity of GCA's security interest), (2) the fraud claims would be futile because the Trustee could not establish the reliance element of a fraud claim, and (3) the amendment would unduly delay the proceeding. However, the court allowed the Trustee to amend his complaint to add allegations that Adams & Reese breached its duties to the estate.

DISCUSSION

**A.  Did Adams & Reese Have a Disqualifying Conflict?**

Plaintiffs contend that Adams & Reese had undisclosed conflicts of interest arising from its connections to GCA and its pre-petition representation of the Debtors. The Bankruptcy Code requires that a professional retained by the debtor in possession not "hold or represent an interest adverse to the estate," and that the professional is "disinterested." 11 U.S.C. §327(a). The Code defines a "disinterested person" as a person (1) who is not a creditor, equity security holder, or insider of the debtor, (2) who is not (or was not within 2 years before the filing of the petition) a director, officer, or employee of the debtor, and (3) who "does not have an interest materially adverse to the interest of the estate or any class of creditors or equity security holders, by

-12-

reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. §101(14). The third prong of Section 101 -- the absence of a materially adverse interest -- is often referred to as a "catch-all" provision designed to prevent the retention of a professional "who in the slightest degree might have some relationship that would color the independent and impartial attitude required by the Code." In re Consolidated Bancshares, Inc., 785 F.2d 1249, 1256 (5th Cir. 1986). Holding an interest adverse to the estate means "to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate that would create either an actual or potential dispute in which the estate is a rival claimant," or "to possess a pre-disposition under circumstances that render such a bias against the estate." In re West Delta Oil Co., Inc., 432 F.3d 347, 356 (5th Cir. 2005). Such an interest creates a meaningful incentive for counsel "to act contrary to the best interests of the estate and its sundry creditors – an incentive to place those parties at more than acceptable risk – or the reasonable perception of one." In re Martin, 817 F.2d 175, 179 n.4 (1st Cir. 1987).

The existence of an adverse interest is inherently fact-bound and must be determined on a case-by-case basis. Both parties presented expert testimony pertaining to whether Adams & Reese had a disqualifying interest or conflict. The Trustee presented the

-13-

testimony of Professor Nancy Rapoport, and Adams & Reese relied on the testimony of Stephen Felsenthal – a retired bankruptcy judge from the Northern District of Texas – and Professor Dane Ciolino. There is no dispute as to the eminence and qualification of these experts, and the court admitted their testimony at trial. However, the issues presented by the parties relating to Adams & Reese's conduct of the bankruptcy case while serving as an estate professional are issues that fall squarely within the province of the court and its role in overseeing the conduct of estate professionals. While expert testimony may provide some guidance to the court, this testimony will be given little weight in the court's application of the relevant standards and its determination of an appropriate sanction.

### 1. Adams & Reese and GCA

Did Adams & Reese have a disqualifying interest or conflict with respect to GCA? The record reflects that Adams & Reese received a $200,000 retainer to represent the Debtors without disclosing that the ultimate source of the retainer was a loan from GCA to an affiliate of the Debtors. According to the Trustee, Adams & Reese had an incentive to favor GCA's interests because of this payment. The Trustee points to the following actions that allegedly demonstrate Adams & Reese's preferential treatment: (1) Adams & Reese drafted a pre-petition "lock up" agreement between GCA and the

-14-

Debtors pursuant to which the Debtors agreed to a certain treatment of GCA in the plan; (2) Adams & Reese failed to challenge GCA's security interest even though it knew that GCA executed the Consent and Agreement, which purportedly released GCA's security interest; (3) Adams & Reese drafted the Dividend Assignment purporting to provide GCA with a replacement lien; and (4) Adams & Reese prepared a "draft" motion for relief from the automatic stay in favor of GCA.

### i. *The Retainer*

The court turns first to the $200,000 retainer. Some courts have held that a debtor's counsel whose retainer or fees are funded by a creditor of the debtor is *per se* disqualified from representing the debtor in possession. See, e.g., In re Huntmar Beaumeade I Limited Partnership, 127 B.R. 363, 365 (Bankr. E.D. Va. 1991) ("Zukerman, Spaeder, by receiving payment of its fees from a creditor of the debtors, is not 'disinterested' as that term is used in Sections 327(a) and 101(13) of the Bankruptcy Code."); In re Black Hills Greyhound Racing Ass'n, 154 B.R. 285, 294-95 (Bankr. S. D. 1993); In re Park-Helena Corp., 63 F.3d 877 (9th Cir. 1995). Other courts take the approach that such payments do not result in a *per se* disqualifying conflict. These courts generally scrutinize the transaction as a whole to determine whether the terms or circumstances of the payment are such as to create a disqualifying conflict. See, e.g., In re Missouri Mining, Inc., 186 B.R. 946, 948

-15-

(W.D. Mo. 1995); In re Palumbo Family Ltd. Partnership, 182 B.R. 447, 466 (Bankr. E.D. Va. 1995); In re Lotus Properties LP, 200 B.R. 388, 393-96 (Bankr. C.D. Cal. 1996). The factors considered by these courts include (1) whether the payment caused injury to the estate, (2) whether the payment prejudiced other creditors, (3) whether the creditor who paid the fees received "any specific advantage," and (4) "whether an actual conflict arising from the payment is apparent." Missouri Mining, Inc., 186 B.R. at 949. The case-by-case approach of Missouri Mining is the better reasoned approach given that the ultimate question for the court is whether counsel has a disqualifying interest or conflict, and that determination is rooted in the facts of the case. The court agrees with the Missouri Mining court that such payment arrangements – whether direct or indirect – do not automatically create a disqualifying interest or conflict. Whether or not a fee arrangement creates a disqualifying interest or conflict requires scrutiny of the arrangement and consideration of the factors identified in Missouri Mining.

In the present case, the Debtors negotiated the funding for Adams & Reese's retainer with CGA because the Debtors did not have the funds to pay the retainer. Under the terms of the agreement, GCA loaned $200,000 to St. Mark's Refinery – a non-debtor affiliate of AIPC – in exchange for a security interest in proceeds

-16-

obtained from the sale of certain real estate owned by St. Mark's. GCA forwarded the funds directly to Adams & Reese at the direction of St. Mark's. Viewing the transaction in its entirety and applying the Missouri Mining factors, the court concludes that GCA's funding of Adams & Reese's retainer did not create a disqualifying interest or conflict. Adams & Reese was not a party to the transaction between GCA and St. Mark's, nor is there any evidence in the record that Adams & Reese agreed to represent GCA or provide GCA with anything in return for the payment. Missouri Mining, Inc., 186 B.R. at 949 (observing that there "were no strings attached to the payment" of counsel's fees by a third party). Nor is there any evidence that GCA agreed to fund future fees and expenses, which undercuts the Trustee's contention that Adams & Reese had an incentive to favor GCA's interests to ensure that the remainder of its fees would be paid. Moreover, the record supports Adams & Reese's contention that it never requested payment of its fees from GCA, and that the decision to fund the retainer through a loan from GCA was made by the Debtors. The cases where courts have found disqualifying conflicts have predominately been cases where the pre-petition connection between debtor's counsel and a creditor called into question whether counsel was "serving two masters." See, e.g., In re McKinney Ranch Associates, 62 B.R. 249 (Bankr. C.D. Cal.1986) (debtor's counsel represented general partners of the debtor who

-17-

were to fund fees while simultaneously representing the debtor in possession); In re Bergdog Productions of Hawaii, Inc., 7 B.R. 890 (Bankr. D. Haw. 1980) (counsel's receipt of payment from principals of the debtor, with principal's guarantee of further payments in exchange for reimbursement from any court-approved compensation, constituted a conflict of interest justifying denial of employment application); In re Marine Power & Equipment Co., Inc., 67 B.R. 643 (Bankr. W.D. Wash.1986) (dual representation of debtor corporation and its officers as co-defendants in connection with criminal proceeding). The circumstances surrounding the GCA loan and the payment of Adams & Reese's retainer do not rise to this level. Finally, there is no evidence that the Debtors' arrangement with GCA harmed the estate or prejudiced other creditors. In the end, the problem for Adams & Reese is not that GCA funded its retainer, it is Adams & Reese's failure to disclose the source of its retainer as required by Rule 2014(a) of the Federal Bankruptcy Rules. As explained below, this violation of Rule 2014(a) provides independent grounds for sanctions. It does not, however, support a finding that Adams & Reese had a disqualifying interest or conflict.

### ii. *Adams & Reese's Treatment of GCA*

The Trustee also contends that Adams & Reese's preferential treatment of GCA is evidenced by its failure to challenge GCA's security interest. According to the Trustee, GCA released its

-18-

security interest when it executed the Consent and Agreement and should not have been treated as a secured creditor. The Trustee contends that Adams & Reese knew about the release, yet negotiated a pre-petition "lock up" agreement that provided that the plan would treat GCA's claim as secured. The Trustee further contends that Adams & Reese also took no action during the bankruptcy case to challenge the secured status of GCA's claim. As further evidence of Adams & Reese's bias, the Trustee points to the execution of the Dividend Assignment and the draft motion for relief from the automatic stay prepared by Adams & Reese. Adams & Reese responds that the Pre-petition Agreement and the negotiations with GCA over the treatment of its claim were not the result of bias toward GCA, but were a reflection of the Debtors' efforts to negotiate a consensual plan that could be confirmed and result in a successful conclusion of the case. While the Trustee focuses on the release of GCA's security interest, Adams & Reese counters that GCA had a colorable argument that the waiver was not effective because it was contingent on the satisfaction of certain conditions. (Exh. E-110.) When Adams & Reese investigated the basis for GCA's secured claim, the firm concluded that the conditions to the release were never satisfied. (Exh. E-80, E-81). Adams & Reese confirmed that GCA retained possession of the pledged shares of AIPK stock, which was

-19-

the basis for GCA's purported security interest.[2] (3 Tr. 80). Adams
& Reese contends that it was faced with the choice of depleting
estate assets in litigating the colorable claim of the estate's
largest creditor or negotiating plan terms with GCA and other
creditors of the estate. Adams & Reese contends that it pursued the
later course based on its judgment that a consensual plan process
would conserve estate assets, ensure the support of the Debtors'
largest creditor, and increase the likelihood of putting forward a
confirmable plan. (3 Tr. 82 - 93). In a supplemental schedule filed
in connection with its retention application, Adams & Reese stated
that negotiations with "GCA, Halifax [another major creditor of the
Debtors], and others led to a general agreement on structuring
agreements, in and subject to Bankruptcy Court approval, which
prompted the current cases as the only feasible solutions that would
have significant creditor support." (Exh. C-1, 3 Tr. 21).

Applying the relevant standards under section 327(a), this is
not a case where counsel is representing two clients with adverse
interests. See, e.g., In re Granite Partners, L.P., 219 B.R. 22, 36
(Bankr. S.D.N.Y. 1998) (counsel to Chapter 11 trustee also
represented financial firm that was subject to claims by the

---

[2] GCA initially relied on the subsequent Dividend
Assignment as the basis for its security interest, but later
amended its proof of claim and asserted the pledged stock as the
basis of its secured claim.

trustee). There is no evidence that GCA was a client of Adams &
Reese either before or during Adams & Reese's representation of the
Debtors – GCA had its own attorneys. Instead, the Trustee focuses
on Adams & Reese's actions toward GCA and contends that Adams &
Reese breached its duties to the estate by advancing the interests
of GCA to the detriment of the estate. See, e.g., In re Kendavis
Industries Int'l, Inc., 91 B.R. 742, 748-50 (Bankr. N.D. Tex. 1988)
(debtor's counsel overwhelmingly favored the interests of the Davis
family – who owned 100% of the stock of the debtor – even though
there was no evidence that counsel formally represented the Davis
family in the chapter 11 case). Courts have held that debtor's
counsel ultimately owes duties to the estate. See In re Hilal, 534
F.3d 498,501 (5th Cir. 2008); In re JLM, Inc., 210 B.r. 19,25 (2nd
Cir. BAP 1997) ("Both management and its counsel have fiduciary
duties to an estate in bankruptcy"); See generally C.R. Bowles and
Nancy B. Rapoport, "Has the DIP's Attorney Become the Ultimate
Creditors' Lawyer in Bankruptcy Reorganization Cases?," 5 Am. Bankr.
Inst. L. Rev. 47 (1997).[3] This duty to the estate does not, however,

_____

[3] The debtor normally remains in control of the business
and the bankruptcy estate in a Chapter 11 case, and is charged
with fiduciary duties in holding the estate and operating the
business for the benefit of the debtor's creditors and equity
holders. See Dodson v. Huff (In re Smyth, III), 207 F.3d 758,
761 (5th Cir. 2000). Counsel to the debtor in possession in turn
owes duties to the debtor. ICM Notes, Ltd. vs. Andrews & Kurth,
LLP, 278 B.R. 117,125 (S.D. Tex. 2002). The case law on the

-21-

extend to individual creditors and equity holders. <u>ICM Notes</u>, 278 B.R. at 126; <u>In re Texasoil Enter.</u>, 296 B.R. 431,435 (Bankr. N.D. 2003). Counsel's duties include a duty to "maximize the estate" and a duty to "exercise independent professional judgment" on behalf of the estate. <u>ICM Notes</u>, B.R. at 278, 124. The problem with the Trustee's theory of the case is that it seems to assume that the negotiations with GCA and Adams & Reese's role in those negotiations on their face amount to a breach of Adams & Reese's duties to the estate. The Bankruptcy Code is structured to encourage a consensual plan process. <u>See</u>, <u>e.g.</u>, <u>In re Kellogg Square Partnership</u>, 160 B.R. 336 (Bankr. D. Minn. 1993) ("Promoting a consensual process in reorganization, in turn, will have the broader benefit of preserving the resources of both debtors and creditors; it will encourage the making of arrangements earlier in the case, it will reduce the likelihood that the plan and disclosure statement will undergo several redrafts after an initial hearing ...."); <u>In re Sentinel</u>

---

nature and scope of duties owed to the estate and creditors is still in flux. Some courts have criticized this broad formulation of counsel's duties to the estate and creditors on the grounds that it imposes "an unwarranted strain on the attorney-client relationship and the attorney-client privilege." <u>In re Cenargo Intern., PLC</u>, 294 B.R. 571,599 (Bankr. S.D.N.Y. 2003); <u>See also</u> <u>ICM Notes</u>, 278 B.R. 123-24 (discussing conflicting decisions on the existence and scope of counsel's duty to the bankruptcy estate); <u>Hansen, Jones & Leta, P.C. v. Segal</u>, 220 B.R. 434 (D. Utah 1998) (debtor's counsel does not owe a fiduciary duty to the estate).

-22-

<u>Management Group, Inc.</u>, 398 B.R. 281 (Bankr. N.D. Ill. 2008) (observing that the Bankruptcy Code is "designed to encourage consensual resolution of claims and disputes through the plan negotiation process"). In light of this policy, it is not unusual for a debtor to negotiate plan terms with its largest creditors. Indeed, such negotiations may be only path to a confirmable plan.

Did Adams & Reese violate its duties to the estate as a result of its involvement in negotiating the Pre-petition Agreement with GCA? The record does not support the Trustee's claim in this regard. Debtors often rely on such pre-petition "lock-up" agreements to ensure the support of key creditors, and courts have generally upheld such agreements. <u>See</u>, <u>e.g.</u>, <u>In re Bush Indust., Inc.</u>, 315 B.R. 292, 303 (Bankr. W.D.N.Y. 2004) (debtor did not "violate any duty of good faith by accepting a lock up agreement that would effectively limit competing options"). The Pre-petition Agreement in the present case provided that GCA would support the Debtors' plan in return for the plan treatment outlined in the agreement. The intervening objection by the Equity Committee required further negotiations over the treatment of equity, GCA, and other creditors, and these negotiations ultimately resulted in a settlement between the Equity Committee and GCA. The confirmed plan reflected this settlement, not the treatment originally envisioned in the Pre-petition Agreement. Considering the record in its

-23-

entirety – including the terms of the Pre-petition Agreement, the reasons for the strategy adopted by the Debtors, and the fact that the negotiations between GCA and the Equity Committee ultimately resulted in a confirmable plan – the court cannot conclude that Adams & Reese breached its duties to the estate. Nor does the record support the Trustee's claim that the Pre-petition Agreement evidences a disqualifying interests or conflict.

Similarly, the record does not support the Trustee's claim that Adams & Reese breached its duties to the estate by not challenging GCA's security interest. The Trustee relies heavily on a June 28, 2005, internal Adams & Reese e-mail authored by Dean Ferguson, who voices serious concerns about the AIPC bankruptcy case. (Exh. P-1). One of those concerns was the validity of GCA's security interest. The Trustee contends that Adams & Reese purposefully ignored the grounds for a challenge to that security interest. While the record reflects that the Debtors may have had colorable grounds to challenge GCA's security interest, the record also shows that GCA had a colorable argument that its security interest was valid because the release was ineffective. In addressing the June 28th e-mail and the question of GCA's security interest at trial, Mr. Ferguson testified that regardless of whether GCA was treated as secured or unsecured, GCA was the largest creditor in the case and "the only way to make sure that other creditors received something

-24-

as well and had the potential to get paid was to, in my view, to cut a deal that made sense for everyone ... [i]f we had to litigate against GCA like we were litigating against Halifax, there wasn't going to be anything for anybody." (3 Tr. 25-26). In other words, Adams & Reese had to consider the cost of litigating GCA's claim and whether litigating this claim was in the best interest of the estate. Adams & Reese and the Debtors ultimately determined that a consensual plan process – not litigation – was in the best interest of the estate. In hindsight, Adams & Reese and the Debtors may have had other options. However, the course they ultimately chose does not amount to a breach of their duties to the estate, nor does it reflect a disqualifying interest or conflict.

Finally, Adams & Reese's role in drafting the Dividend Assignment and the draft motion for relief from the automatic stay does not evidence a disqualifying conflict or interest. With respect to the Dividend Assignment, the Trustee contends that the assignment was defective because Adams & Reese failed to record it. As a result, according to the Trustee, Adams & Reese wanted to avoid a challenge to the Dividend Assignment for fear of potential liability to GCA. The evidence pertaining to the Dividend Assignment does not support a finding that Adams & Reese was disinterested or that it held an interest adverse to the estate. The record reflects that GCA did not rely on the Dividend Assignment

-25-

in its litigation with the Equity Committee. Rather, GCA relied on the pre-petition pledge of AIPK stock that was never formally released. As far as potential liability to GCA, the record reflects that Adams & Reese prepared the documents at the request of the Debtors and was not serving as GCA's counsel. With respect to the motion to lift stay, Adams & Reese contends that the motion was drafted to help overcome a stalemate in negotiations with the Equity Committee and was never filed. GCA ultimately did file a motion for relief, but the motion was drafted and filed by its own bankruptcy counsel. One could question the wisdom of Adams & Reese's strategy in hindsight, and the experts proffered by both sides characterized the strategy as highly unusual. However, the record is consistent with Adams & Reese's position that the draft motion was intended to overcome a stalemate in negotiations and to push the case toward confirmation. There is no evidence that the estate was prejudiced by Adams & Reese's actions with respect to GCA.

In sum, the record reflects a very different case from the conduct that prompted sanctions in the Kendavis Industries case. In Kendavis Industries, the court found that the "totality of the evidence" and the "objective manifestations" of counsel's conduct during the case showed that counsel was actually representing the interests of the Davis family, and that those interests were adverse

-26-

to the estate. 91 B.R. at 751. The "objective manifestations" cited by the court included a proposed plan that "was inexplicably generous to the stockholders" even though the debtor was insolvent. Id. In contrast to Kendavis Industries, the plan in the present case provided for the payment of 100% of allowed secured and unsecured claims, and provided for a distribution to junior equity interests. Accordingly, considering the totality of the circumstances, Adams & Reese's conduct in the case does not reflect a disqualifying bias in favor of any one creditor or constituency.

### 2. Adams & Reese's Pre-petition Representation of the Debtors.

The Trustee also contends that Adams & Reese has a disqualifying conflict under section 327(a) as a result of its pre-petition representation of the Debtors. Specifically, Adams & Reese was retained to serve as an escrow agent for the CGC transactions in November 2003. Approximately half of the $5 million received by AIPC as a result of the sale of CGC was paid to AIPC's officers for back wages and retention payments for future services. The Trustee contends that the CGC transactions and the payments to insiders were subject to avoidance, that Adams & Reese knew about the payments and the grounds to avoid the CGC transactions, and that Adams & Reese failed to pursue avoidance actions because of its role in the transactions. Adams & Reese was also retained by AIPC in 2004 to assist with its restructuring efforts, which included negotiations over a lock-up agreement with CGA and the Dividend Assignment.

-27-

The Bankruptcy Code provides that "a person is not disqualified for employment under Section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. §1107(b). A professional may, however, be disqualified if the pre-petition work performed for the debtor gives rise to a disqualifying conflict under section 327(a). With respect to Adams & Reese's role in the CGC transactions, the record does not reflect such a disqualifying interest. Adams & Reese's role in the transactions was limited to its retention as an escrow agent. It does not appear that Adams & Reese opined on the validity of the transactions. Even if Adams & Reese had offered an opinion in connection with the transactions, it is not clear that this opinion, standing alone, would give rise to a disqualifying conflict. See, e.g., In re Westside Creek Ltd. Partnership, 93 B.R. 177, 179 (E.D. Ark. 1988) (no conflict where debtor's counsel had previously issued a written opinion for a prior owner of property owned by the estate that conflicted with the position taken by the debtor in the bankruptcy case). Nor does the record reflect a disqualifying interest with respect to the pre-petition lock-up agreement and the Dividend Assignment for reasons outlined previously. Accordingly, the court concludes that Adams & Reese did not have a disqualifying interest as a result of its prior representation of the Debtors.

-28-

## B. Adequacy of Disclosures

The Trustee also challenges the adequacy of Adams & Reese's disclosures. Rule 2014(a) of the Federal Bankruptcy Rules requires that a prospective estate professional (1) file an application for an order approving the retention of the professional, and (2) disclose all "connections with the debtor, creditors, any other party in interest, [and] their respective attorneys and accountants." The scope of disclosure under rule 2014(a) is broader that rules governing disqualification. An applicant must disclose all connections regardless of whether the connections rise to the level of a disqualifying conflict under Section 327(a). In re Olsen Indus., Inc., 222 B.R. 49, 60 (Bankr. D. Del. 1997); In re Leslie Fay Cos., 175 B.R. 525, 532 (Bankr. S.D. N.Y. 1994). Proper disclosure is vital to the court's role in policing section 327(a). Accordingly, courts have imposed heavy sanctions on applicants who fail to fully disclose all connections, even if those connections do not rise to the level of a disqualifying conflict. See, e.g. In re Granite Partners, L.P., 219 B.R. 22 (Bankr. S.D. N.Y. 1998). Adams & Reese does not dispute that it did not fully comply with the disclosure requirements of Rule 2014(a). The record reflects that Adams & Reese failed to fully disclose:

- the source of its initial $200,000 retainer and the agreement between Debtors' and GCA that funded the retainer;

-29-

- the existence and terms of the Pre-petition Agreement and Adams & Reese's role in the creation of the Dividend Assignment; and

- Adams & Reese's pre-petition relationship with the Debtors, including its role as a neutral escrow agent in the pre-petition CGC transactions.

Even though these connections do not reflect a disqualifying conflict, Adams & Reese was required to disclose these connections under Rule 2014(a). Although Adams & Reese concedes that these connections were not explicitly disclosed, it contends that its disclosures indirectly referred to the connections. For example, Adams & Reese contends that a supplemental disclosure to its retention application stated that "[n]egotiations with GCA, Halifax, and others led to a general agreement on structuring agreements ...." and that this language refers to the Pre-petition Agreement. Adams & Reese also points to its disclosure that "at various times between 2000 and 2004, AIPK issued either stock or dividend pledge agreements to GCA to secure AIPC's obligation to GCA." (Debtors' Supplemental Schedule at Response No. 5[a]). The court, however, finds that these disclosures do not provide sufficient information about Adams & Reese's pre-petition contacts with the Debtors or GCA to satisfy the requirements of Rule 2014(a). Granite Partners, 219 B.R. at 36 (noting that "boiler plate" disclosures are rarely sufficient to parties on notice of all connections).

-30-

Courts generally impose significant sanctions for violations of Rule 2014(a), including the denial or disgorgement of counsel's fees. See, e.g., In re Balco Equities Ltd., Inc., 345 B.R. 87 (S.D.N.Y. 2006) (disallowing all fees because of counsel's failure to fully disclose all connections); Granite Partners, 219 B.R. at 44 (disallowing all fees arising from portion of representation that involved an undisclosed conflict with a current client); Kendavis Industries, 91 B.R. at 762 (reducing fees by 50% as a result of counsel's conflicts); In re Smitty's Truck Stop, Inc., 210 B.R. 844, 850 (10th Cir BAP 1997) ("Failure to disclose connections that have the potential for creating a conflict warrants a denial of all compensation ...."). Courts have considered the following factors in determining the appropriate sanctions for failing to comply with the disclosure requirements of Rule 2014(a):

- Whether the connections at issue would have created a disqualifying interest under section 327(a);

- whether the failure to disclose was inadvertent or intentional;

- the materiality of the information omitted;

- counsel's efforts to correct the deficiency; and

- the benefits provided to the estate by counsel.

While the Trustee contends that Adams & Reese's failure to comply with Rule 2014(a) was intentional, the record does not support a finding that these violations were intentional. Moreover, the

-31-

record does not reflect any prejudice or harm to the estate or to creditors as a result of Adams & Reese's violation of Rule 2014(a). In fact, Adams & Reese's efforts in the case resulted in the successful confirmation of a plan that provided for all secured and unsecured claims, and provided a distribution to equity. The court has also found that Adams & Reese did not have a disqualifying conflict or interest. These factors weigh against the sanctions award requested by the Trustee: disgorgement of all the fees and expenses awarded to Adams & Reese in the case as well as the award of additional punitive sanctions. These violations of Rule 2014(a), however, merit a sanctions award that exceeds the *de minimis* sanction suggested by Adams & Reese. The disclosure lapses at issue here are significant because they implicate two of the central disputes in the bankruptcy case – GCA's security interest and the avoidance of the CGC transactions. Even though the court has determined that Adams & Reese did not possess a disqualifying interest or conflict arising from its connections with GCA, the relevant connections should have been fully disclosed pursuant to Rule 2014(a) at the start of the case. This initial failure to disclose was exacerbated by counsel's delay in fully curing the omission until after plan confirmation and after the present adversary proceeding was filed. After considering the record as a whole, the court concludes that the appropriate sanction for the

-32-

failure to comply with Rule 2014(a) is the disgorgement of $135,000 of the fees awarded to Adams & Reese. This sanction amounts to approximately 20% of the $678,936 in total fees awarded in the case, and over two-thirds of the $200,000 retainer funded by GCA.

### CONCLUSION

For the reasons set forth herein, the court finds that Adams & Reese failed to comply with the disclosure requirements of Rule 2014(a) and failed to timely correct its defective disclosures. Accordingly, the court orders that Adams & Reese must disgorge $135,000 of the fees it was awarded as counsel for the Debtors. In all other respects, the Trustee's claims are denied and the Trustee shall recover nothing. The Trustee shall submit a judgment in conformity with this Memorandum Ruling within 30 days.

### ###

-33-